United States District Court
Southern District of Texas
**ENTERED**
October 01, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ZOE MILAN BARINAGA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-CV-03462** |
| | § | |
| **EXXONMOBIL CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Since 1994, Plaintiff Zoe Milan Barinaga climbed the corporate ladder at Defendant ExxonMobil Corporation ("ExxonMobil"). Over the years, she received multiple promotions, landed several jobs, and earned many bonuses. But like most relationships, Barinaga's employment relationship wasn't perfect. She alleged that her career was marked by years of discrimination and retaliation. So she eventually brought four claims under Title VII of the Civil Rights Act of 1964, Section 1981, and the Texas Labor Code: (1) race discrimination; (2) national-origin discrimination; (3) sex discrimination; and (4) retaliation. (Dkt. No. 29 at 7–12). Now, ExxonMobil moves for summary judgment, arguing that Barinaga's claims come too late and lack merit. (Dkt. No. 45).

Before the Court are two motions: Defendant ExxonMobil Corporation's Motion for Summary Judgment, (Dkt. No. 45), and its Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 59). For the reasons below, the Court **GRANTS** the Motion for Summary Judgment. (Dkt. No. 45). Because the Court did not consider or rely on the

challenged summary-judgment evidence, it **DENIES as moot** the Motion to Strike Plaintiff's Summary Judgment Evidence.  (Dkt. No. 59).

## I.    BACKGROUND[1]

ExxonMobil hired Barinaga in 1994.  (Dkt. No. 45-2 at 4).  Over the next three decades, she had a career that, on paper, looked successful.  She rose through the ranks, becoming the Global Marketing Manager in 2015, a Business Manager in Singapore in 2017, the Baytown Chemical Plant Process Manager in 2018, and the Major Growth Ventures Planning and Prospecting Manager in 2023.  (*Id.*).

Barinaga also ranked well compared to her peers,[2] receiving the second-highest rating ("Excellent") multiple times and the highest rating ("Outstanding") once.  (*Id.* at 4–5).  Her Individual Development Plan ("IDP") and ExxonMobil's own "Potential" ratings[3] indicated that Barinaga appeared destined for an executive-level or even a vice-president position.  (*See id.* at 4).

---

[1]    Except where noted, this Section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant.  *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).  The Court has not weighed evidence or made credibility findings.  *Id.*

[2]    ExxonMobil evaluates employees against their peers.  (Dkt. No. 45-2 at 2).  Before 2020, the company used a Rank Group Percentile ("RGP").  (*Id.*).  An RGP of 66 or higher placed an employee in the top third of their assessment group.  (*Id.*).  Barinaga scored a 66 in 2017, a 61 in 2018, a 66 in 2019, and an 80 in 2020.  (*Id.* at 4).

[3]    ExxonMobil gives each employee a numeric "Potential" score, which it defines as "a long-term indicator of the highest level an employee might be able to reach near the end of their career."  (Dkt. No. 45-2 at 3).  The company uses Potential to forecast career paths and guide staffing and business-development decisions.  (*Id.*).  An employee's Potential score reflects their capability, demonstrated functional and behavioral skills, mobility, business needs, and availability of positions or opportunities.  (*Id.*).  A Potential of 30 or higher indicates that an employee may reach an executive-level position by the end of their career.  (*Id.*).  With a Potential of 38, Barinaga was on track to become an executive at ExxonMobil.  (*Id.*).

Her promotions reflected that path. ExxonMobil promoted her to Classification Level[4] ("CL") 30 on July 1, 2012, (*id.*), bringing her within the executive tier of employees, (*id.* at 3). ExxonMobil promoted her to CL 31 on January 1, 2015; CL 32 on August 1, 2018; and CL 33 on January 1, 2024. (*Id.* at 4).

But Barinaga claims that a different story is hidden behind the curtains of promotions and high ratings—one marked by years of discrimination and retaliation. (*See* Dkt. No. 29 at 2–12). This story may be divided into three chapters: (1) the 2015–2018 Chapter; (2) the 2020 Chapter; and (3) the 2023 Chapter.

### A. THE 2015–2018 CHAPTER

The first chapter begins in January 2015, when Barinaga began working under Cindy Shulman. (Dkt. No. 45-1 at 5). This marked a turning point in her career.

#### 1. <u>Alleged Discrimination</u>

At this time, Shulman allegedly discriminated against Barinaga by (1) creating a "hostile and manipulative" work environment; (2) exhibiting a volatile, confrontational work style; (3) making threatening comments to subordinates; (4) making inappropriate comments about employees' ethnicity and religious beliefs; and (5) disclosing private ranking and performance information to subordinates about their peers. (Dkt. No. 50-1 at 3) (SEALED). For example, Barinaga claims that Shulman became upset easily, raised her voice at Barinaga, told her that she was "naïve to think that being Hispanic was not

---

[4] At ExxonMobil, an employee's CL number indicates the level and complexity of his or her role in the company. (Dkt. No. 52-23 at 4). As a result, increasing an employee's CL score is typically regarded as a promotion. (*Id.*).

the reason for where she was in her career," and once screamed at Barinaga to leave the office and never speak to her again.  (Dkt. No. 45-2 at 5).  Shulman also allegedly gave Barinaga a lower performance score than she had received in previous years.  (Dkt. No. 52-1 at 2).

But Shulman was not the only problem.  Barinaga describes another incident in May 2016, when Shulman organized a team-building event at the Westin Hotel in The Woodlands, Texas.  (Dkt. No. 50-1 at 15) (SEALED).  The event began with an off-site dinner where alcohol was served.  (*Id.*) (SEALED).  Over time, the team migrated to the hotel pool area, where several employees continued drinking.  (*Id.*) (SEALED).

One employee, Thomas Deman, became visibly intoxicated.  (*Id.* at 4) (SEALED); (Dkt. No. 45-1 at 23).  In fact, while he was standing behind Barinaga and another female employee, Deman stripped down to his underwear and jumped into the pool.  (Dkt. No. 50-1 at 15) (SEALED).  Barinaga tried to ignore the scene and continued talking with other coworkers.  (Dkt. No. 45-1 at 23); (Dkt. No. 50-1 at 15) (SEALED).

Hotel staff attempted to remove Deman, but Shulman intervened, assuring them that she would handle the situation and cut Deman off from more drinks.  (Dkt. No. 45-1 at 23).  The hotel staff allowed Deman to stay under that condition.  (Dkt. No. 50-1 at 15) (SEALED).  Later, Deman got dressed again, sat beside another female coworker, and began massaging her back, making her feel "uncomfortable and froze[n]."  (*Id.*) (SEALED).

After going to the bathroom, Barinaga returned to find only two people at the pool, one of them Deman.  (Dkt. No. 45-1 at 23).  When no one else returned, she decided to

leave for her hotel room.  (Dkt. No. 45-1 at 23); (Dkt. No. 50-1 at 16) (SEALED).  As she left, Deman asked the other individual to get him a drink.  (Dkt. No. 45-1 at 23); (Dkt. No. 50-1 at 16) (SEALED).  While the other person was getting the drink, Deman started following Barinaga to the hotel elevator.  (Dkt. No. 45-1 at 23); (Dkt. No. 50-1 at 16) (SEALED).  Once inside, Barinaga pressed "7" for her floor; Deman pressed "6" for his but did not exit when the doors opened.  (Dkt. No. 45-1 at 23–24); (Dkt. No. 50-1 at 16) (SEALED).

Sensing danger, Barinaga didn't exit the elevator on the seventh floor because she didn't want Deman following her to her room.  (Dkt. No. 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 23–24).  Instead, she headed to a female coworker's room on the ninth floor, telling Deman that she was texting her female coworker and was going to her coworker's room.  (Dkt. No. 50-1 at 16) (SEALED).  As the elevator made its way to the ninth floor, Deman crept closer to Barinaga, put his arm around her, and started "putting his hands" "[a]ll over" her.  (Dkt. No. 45-1 at 24).  Barinaga told him to stop and tried to move away.  (Dkt. No. 50-1 at 16) (SEALED).  She then exited and texted her coworker to come out of the room.  (*Id.*); (Dkt. No. 45-1 at 24).  But her coworker never responded, and Deman continued following her off the elevator.  (Dkt. No. 50-1 at 16); (Dkt. No. 45-1 at 24).

Barinaga hopped back into the elevator, went to her floor, and tried to reach to her room, but Deman still followed her.  (Dkt. No. 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 24).  When she confronted him, Deman reached around her back and tried to pull her in for a

kiss.[5] (Dkt. No 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 24). Barinaga pushed him away and screamed for him to leave. (Dkt. No. 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 24). Deman stumbled backward, gestured to his cheek, and finally left. (Dkt. No. 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 24). Barinaga's coworker then responded to her texts and came down to Barinaga's room, where they discussed Deman's conduct. (Dkt. No. 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 24).

Sometime later, Barinaga told Michael Zamora—one of her friends who worked for a different part of ExxonMobil at the time—about her incident with Deman. (Dkt. No. 45-5 at 2); (Dkt. No. 45-6 at 18–19); (Dkt. No. 52-2 at 3). Barinaga asked Zamora not to share this information with anyone else because she was just coming to him as a friend and did not view Deman's conduct as a policy violation. (Dkt. No. 45-5 at 2–3); (Dkt. No. 45-6 at 18–19); (Dkt. No. 52-1 at 3).

Then, in January 2017, Barinaga relocated to Singapore as a manufacturing business manager. (Dkt. No. 52-2 at 4); (Dkt. No. 45-2 at 4). Although the position was supposed to last four years, she returned to Houston in the summer of 2018 to become the Baytown Chemical Plant Process Manager. (Dkt. No. 45-1 at 14–15); (Dkt. No. 45-2 at 4).

**2. <u>Barinaga's First HR Complaint</u>**

Barinaga eventually broke her silence. In July 2018, as she transitioned from Singapore back to Houston, Zamora urged her to report the incident with Deman to HR.

---

5 Deman's lips did not physically touch hers, but he did physically touch her shoulder and back when he tried to kiss her. (Dkt. No 50-1 at 16) (SEALED); (Dkt. No. 45-1 at 24).

(Dkt. No. 45-5 at 3); (Dkt. No. 52-2 at 5). Zamora had learned that ExxonMobil was considering Deman for higher-level roles and believed management should know about his conduct. (Dkt. No. 45-5 at 3).

On July 23, 2018, Barinaga submitted her first HR complaint, naming both Cindy Shulman and Thomas Deman. (Dkt. No. 45-2 at 5). Barinaga alleged that Shulman discriminated against her between 2015 and 2016 because of her race, national origin, sex, and religion. (*Id.*). She further alleged that Shulman (1) condoned inappropriate behavior at the May 26, 2016, team-building event; (2) told others not to disclose what had occurred; and (3) failed to discipline the individuals involved or report the incident. (Dkt. No. 50-1 at 3) (SEALED). As to Deman, Barinaga reported unwelcome physical contact and other inappropriate behavior at the same 2016 event. (Dkt. No. 45-2 at 5); (Dkt. No. 50-1 at 3) (SEALED).

**3. <u>ExxonMobil's Investigation</u>**

ExxonMobil launched an investigation in response to Barinaga's complaint. (Dkt. No. 45-2 at 6). Compliance Manager Dan Whitfield and co-investigator Latasha McDade interviewed Barinaga and 11 other employees, including Shulman and Deman. (*Id.*).

This investigation substantiated some of Barinaga's allegations. The investigators concluded that Shulman demonstrated inappropriate leadership and management decisions. (Dkt. No. 50-1 at 4) (SEALED). The investigation confirmed that Shulman exercised extremely poor judgment, inappropriate leadership, and a lack of accountability at the team-building event when she encouraged consumption of alcohol at the company-sponsored event. (Dkt. No. 45-2 at 6); (Dkt. No. 50-1 at 4) (SEALED).

Indeed, the investigation found that Shulman condoned egregious horseplay as a result of the alcohol consumption and failed to monitor the effect of alcohol on her employees attending the event. (Dkt. No. 45-2 at 6); (Dkt. No. 50-1 at 4) (SEALED). And the investigation revealed that Shulman photographed Deman after he jumped into the swimming pool undressed and failed to report or address the inappropriate behavior. (*Id.*) (SEALED).

But the investigation did not corroborate Barinaga's claims that Shulman made comments about her race, ethnicity, or religion or that she disclosed confidential ranking or performance information to subordinates. (Dkt. No. 45-2 at 6); (Dkt. No. 50-1 at 4) (SEALED). Even so, ExxonMobil instructed Shulman to retire, which she did. (Dkt. No. 45-2 at 6).

As for Deman, the investigation found that he engaged in highly inappropriate behavior. (*Id.*). It concluded that Deman consumed too much alcohol at the company-sponsored event and was so drunk that he couldn't even remember what happened. (Dkt. No. 50-1 at 5) (SEALED). Witnesses reported that Deman stripped to his underwear before jumping into the hotel pool and subjected several women to unwanted touching during and after the event. (*Id.*) (SEALED). Investigators concluded that he followed Barinaga to her hotel room and attempted to kiss her. (*Id.*) (SEALED). Deman did not deny Barinaga's allegations and admitted that he was so intoxicated that he could not recall what happened. (Dkt. No. 45-2 at 6). ExxonMobil thus reprimanded Deman, lowered his Potential from 38 to 34, barred him from near-term leadership consideration, and reduced his 2018 compensation incentives by $200,000. (*Id.*).

### B. THE 2020 CHAPTER

The second chapter began almost two years later, when two regional directors retired in early June 2020. (Dkt. No. 45-8 at 3). Their departure required ExxonMobil to choose the next plant manager for the Baytown Chemical Plant. (*Id.*).

#### 1. <u>2020 Plant Manager Decision</u>

Barinaga wanted the job, (Dkt. No. 52-23 at 4), but ExxonMobil was reviewing multiple candidates, (Dkt. No. 45-8 at 3). For this decision, ExxonMobil weighed the company's future organizational needs, the competency of the current plant leadership, and each candidate's leadership capabilities, risk-management skills, and prior plant-managing experience. (*Id.*); (*see also* Dkt. No. 45-9 at 6); (Dkt. No. 45-10 at 9).

Although ExxonMobil considered Barinaga a potential candidate for the role at some point in the future, it concluded that she "needed more time" in her current process-manager role and was not the best candidate at that time. (Dkt. No. 45-8 at 3). Instead, the company chose Wim Blokker for the position, believing that he was the most qualified candidate. (*Id.*).

ExxonMobil chose Blokker because of his previous role as the Rotterdam Chemical Plant Operations Manager and then-current position as the Mont Belvieu Plant Manager, both of which gave him plant-leadership and operations-management experience. (*Id.* at 3–4). ExxonMobil noted that Blokker had "performed well, demonstrated leadership acumen and strong strategic thinking, and shown he could lead a site reorganization and integration of multiple facilities" in these roles. (*Id.* at 3).

Barinaga, by contrast, had never been a plant manager or operations manager. (*Id.*). While her Singapore business-manager role included oversight of some manufacturing operations, ExxonMobil considered that experience less relevant because the plant managers who had reported to her were not executive-level employees and the plants she oversaw were smaller and less complex than those under Blokker's supervision. (*Id.*).

**2. Barinaga's Second HR Complaint**

Barinaga disagreed with ExxonMobil's decision. On November 20, 2020, she complained to HR, alleging that ExxonMobil passed over her in retaliation for her earlier report. (Dkt. No. 45-2 at 6). ExxonMobil investigated and concluded that there was no retaliation. (*Id.*). The company pointed to her improved performance rankings, unchanged Potential score, and an IDP that continued to identify her as a future plant-manager candidate. (*Id.*).

**3. First EEOC Charge**

Still dissatisfied, Barinaga filed a charge of discrimination with the EEOC on April 1, 2021. (Dkt. No. 52-20). She alleged that ExxonMobil discriminated against her because of her national origin, religion, and sex, and that ExxonMobil retaliated against her for her 2018 complaint about Deman and Shulman by denying her the plant-manager position in 2020. (*Id.* at 3–4).

**4. This Lawsuit**

On August 22, 2022, Barinaga sued ExxonMobil in Texas state court for race discrimination, sex discrimination, national-origin discrimination, religious

discrimination, and retaliation under federal and state law. (Dkt. No. 1-4). ExxonMobil removed the case to this Court. (Dkt. No. 1).

### C. THE 2023 CHAPTER

Barinaga's story continued even after the lawsuit was filed. Soon after the second chapter ended, the third began when ExxonMobil merged its Chemicals and Fuels & Lubricants divisions in 2022 to create ExxonMobil Product Solutions. (Dkt. No. 45-2 at 6). The reorganization consolidated several positions and reduced the number of high-level positions in the new division, including cutting regional director positions down to three. (*Id.*).

#### 1. 2023 Major Growth Venture Decision

Because of this reorganization, ExxonMobil considered Barinaga for several other roles, including one in Major Growth Ventures. (*Id.* at 6–7). Major Growth Ventures, a hybrid organization within the Product Solutions division, (*id.*), manages large projects that drive company growth, (Dkt. No. 45-4 at 3). The team integrates business operations, capital projects, and new-business development, bridging ExxonMobil's operations and business-and-projects units. (*Id.*).

ExxonMobil considered Barinaga for a position in Major Growth Ventures because her background combined both operational and business experience, the two skill sets Major Growth Ventures required. (*Id.* at 16). The company viewed her as bringing operational knowledge, strong business acumen, and the ability to develop new growth opportunities for product solutions. (*Id.*)

While Barinaga still wanted the plant-manager position at the Baytown Chemical Plant, (Dkt. No. 45-4 at 6, 11); (Dkt. No. 52-23 at 3), ExxonMobil allegedly didn't consider her competitive for plant-manager roles on the manufacturing side because she lacked refinery experience. (Dkt. No. 45-5 at 3). With the merger shrinking the number of leadership positions, ExxonMobil sought candidates with experience in both chemicals and refining for regional-director positions and other high-level roles. (*Id.* at 4); (Dkt. No. 45-12 at 3). ExxonMobil aimed "to cross-pollinate perspectives and practices" by having employees with refinery experience bring their experiences and ideas to chemical plants, and vice-versa. (Dkt. No. 45-12 at 3).

This increased competitiveness allegedly made it less likely for Barinaga to reach a regional-director position even if she became a plant manager. (*Id.*). ExxonMobil concluded that placing her in the Baytown plant-manager role would have decreased her ability to reach a role that met Potential 38. (Dkt. No. 45-5 at 3–4). Purportedly believing that Major Growth Ventures offered her "a credible path" to a vice-president role on the ventures side, ExxonMobil selected her for the position. (*Id.* at 4). On May 18, 2023, the company named her the next Major Growth Ventures Planning and Prospecting Manager, with a scheduled start date of June 1, 2023. (Dkt. No. 45-2 at 7).

**2. <u>2023 Plant Manger Decision</u>**

Six days later, Blokker informed ExxonMobil that he needed to work from home temporarily because of a medical issue. (*Id.*). Without Blokker onsite, ExxonMobil postponed Barinaga's transition to Major Growth Ventures until August 2023, when Blokker was expected to return. (*Id.*).

By August 2023, Blokker's condition had not improved, and he required medical leave through the end of 2023. (*Id.*). ExxonMobil decided to replace him with a new plant manager. (*Id.*). Barinaga was a potential candidate, but ExxonMobil ultimately did not revisit its earlier decision to transition her to Major Growth Ventures. (Dkt. No. 45-4 at 13).

Instead, ExxonMobil considered two candidates: Glenn Hayes and Rohan Davis. (*Id.*); (Dkt. No. 45-10 at 7). Davis had previously managed the Baytown and Sarnia refineries, (Dkt. No. 45-10 at 7), while Hayes had served as the Sarnia Refinery Manager and helped integrate the Sarnia Refinery and Sarnia Chemical Plant into the Sarnia Integrated Complex, (Dkt. No. 45-12 at 3).

Seeking to "cross-pollinate" refinery and chemicals experience, ExxonMobil chose Hayes, (Dkt. No. 45-5 at 4), citing his refinery experience, his work integrating the refining and chemical operations in Sarnia, (Dkt. No. 45-12 at 3), and his ability to handle fast-paced sites, (Dkt. No. 45-5 at 4).

On September 1, 2023, Hayes became the next Baytown Chemical Plant Manager. (Dkt. No. 45-2 at 7). He did not receive a CL promotion with the role. (Dkt. No. 42-18 at 9) (SEALED).

**3. <u>Second EEOC Charge</u>**

Barinaga viewed her reassignment to Major Growth Ventures and Hayes's selection as plant manager as additional acts of retaliation and discrimination. (*See* Dkt. No. 45-1 at 61). On September 1, 2023, she filed a second EEOC charge claiming that

ExxonMobil retaliated and discriminated against her by moving her to a new division and denying her the Baytown plant-manager position. (*Id.* at 59–61).

### D. RECENT PROCEDURAL HISTORY

After filing her second EEOC charge, Barinaga amended her complaint to address the recent employment actions. (Dkt. No. 29). In her Second Amended Complaint, she asserted four claims under Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act: (1) race discrimination; (2) national-origin discrimination; (3) sex discrimination; and (4) retaliation.[6] (*Id.* at 7–12).

ExxonMobil answered and raised several affirmative defenses. (Dkt. No. 31). It moved for summary judgment after discovery. (Dkt. No. 45). Barinaga responded, (Dkt. No. 52), and ExxonMobil replied, (Dkt. No. 58). ExxonMobil also moved to strike one of Barinaga's summary-judgment exhibits. (Dkt. No. 59). Barinaga responded, (Dkt. No. 64), and ExxonMobil replied, (Dkt. No. 65).

---

6 Barinaga's live pleading could be construed as asserting what some courts call "intersectional claims." *See, e.g.*, *Thomas v. Cook Children's Health Care Sys.*, No. 4:20-CV-01272, 2021 WL 4796679, at *7 (N.D. Tex. July 28, 2021), *aff'd*, No. 22-10535, 2023 WL 5972048 (5th Cir. Sept. 14, 2023). These claims "are like those based on race but with the added component of sex." *Id.* (first citing *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam); then citing *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980); and then citing *EEOC v. DynMcDermott Petroleum Operations Co.*, 537 F.App'x 437, 466 (5th Cir. 2013) (per curiam)). They arise from "the theory that an employer cannot evade Title VII liability for discrimination" against a Black woman by showing that it does not discriminate against Black men or white women. *Id.* (citing *Jefferies*, 615 F.2d at 1032).

The Court need not decide whether Barinaga's allegations qualify as intersectional claims because they require the plaintiff to prove "*both* race *and* sex discrimination." *Id.* (emphasis added) (citing *Leah*, 731 F.3d at 414–15). And as discussed below, Barinaga has shown neither. *See infra* Section III(B).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v.*

*Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).  "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).  If evidence is merely colorable or not significantly probative, summary judgment is appropriate.  *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant.  *Carr*, 866 F.3d at 601.  This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075.

## III.   DISCUSSION

ExxonMobil argues that summary judgment is appropriate for two reasons: (1) several of Barinaga's claims are untimely and unexhausted, (Dkt. No. 45 at 20–22); and (2) all of her claims fail on the merits, (*id.* at 22–34).  The Court address each argument in turn.

### A.   TIMELINESS OF BARINAGA'S CLAIMS

ExxonMobil first contends that many of Barinaga's claims are time-barred.  (*Id.* at 20–22).  After addressing the federal and state claims separately, the Court agrees.

**1. <u>Federal Claims</u>**

To begin, ExxonMobil argues that several of Barinaga's federal claims are untimely. (*Id.*). It contends that many of the actions included in her Title VII claims fall outside the statutory filing period, (*id.*), and that portions of her claims under 42 U.S.C. § 1981 are also time-barred, (*id.* at 21 n.3). The Court addresses the Title VII claims first.

a. <u>Title VII Claims</u>

ExxonMobil maintains that much of the conduct Barinaga cites under Title VII occurred outside the limitations period for filing an EEOC charge. (*See id.* at 20–22). Specifically, it argues that her first EEOC charge covers actions by Shulman or Deman that are untimely, and that for her second EEOC charge, any employment action before November 5, 2022, falls outside the limitations period. (*Id.* at 20–21). By ExxonMobil's account, the only conduct within Title VII's statutory period includes (1) its 2020 decision to hire Blokker instead of Barinaga as Baytown plant manager; (2) its 2023 transfer of Barinaga to Major Growth Ventures and selection of Hayes as plant manager; and (3) any decision not to promote Barinaga after November 5, 2022. (*Id.* at 21).

The Court agrees. "Under Title VII, a plaintiff normally has 180 days after an alleged violation to file a charge with the EEOC." *Sanders v. Univ. of Tex. Pan Am.*, 776 F.App'x 835, 837 (5th Cir. 2019) (per curiam). In a deferral state, like Texas, that provides a state or local administrative mechanism to address complaints of employment discrimination, a Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days after learning of the conduct alleged. *Wells v. Texas Tech Univ.*, 2025 WL 673439, at *3 (5th Cir. Mar. 3, 2025) (citing *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir.

1998)). If "discrete acts of discrimination or retaliation . . . occur outside the statutory time period," Title VII precludes recovery for them. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 122 S.Ct. 2061, 2068, 153 L.Ed.2d 106 (2002).

Barinaga filed her first EEOC charge on April 1, 2021, (Dkt. No. 52-20), and 300 days before that is June 5, 2020. Her allegations about Deman and Shulman involve conduct from 2015 and 2016, (Dkt. No. 52-20 at 3), well outside of the statutory window.

Baringa attempts to avoid this by arguing that the Lilly Ledbetter Fair Pay Act of 2009 extends the statutory time period for her allegations involving Shulman because the negative reviews given by Shulman were "discriminatory compensation decision[s]" that affected her "each time wages . . . [were] paid." (Dkt. No. 52 at 30) (quoting 42 U.S.C. § 2000-5(3)(A)).

This argument fails. The Fifth Circuit has held that "the Ledbetter Act does not apply to 'discrete acts' by employers such as 'termination, failure to promote, denial of transfer, and refusal to hire'" even if they touch on pay. *Niwayama v. Tex. Tech Univ.*, 590 F.App'x 351, 356 (5th Cir. 2014) (per curiam) (quoting *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F.App'x 346, 349–50 n.2 (5th Cir. 2010) (per curiam)). This reasoning is in line with several other circuits. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 630–31 (10th Cir. 2012) ("[The Ledbetter Act] did not create a 'limitations revolution for any claim somehow touching on pay'"); *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C. Cir. 2010) ("[T]he phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not

promoting one employee but not another to a more remunerative position."); *Noel v. The Boeing Co.*, 622 F.3d 266, 275 (3rd Cir. 2010).

Shulman's conduct was the kind of "discrete act" discussed in *Niwayama* that, while potentially touching on pay, was not a "discriminatory compensation decision." Any claims based on Deman and Shulman's conduct from 2015 and 2016 are untimely under Title VII.

Barinaga's first charge also challenged ExxonMobil's late-2020 decision to not hire her for the Baytown plant-manager position. (*Id.* at 4). Because that decision occurred sometime around August[7]—within the 300-day window that started on June 5, 2020—those claims are timely.

Barinaga filed her second EEOC charge on September 1, 2023. (Dkt. No. 45-1 at 59–61). Using the 300-day measure, the window for that charge opens on November 5, 2022. Any portion of the second charge challenging conduct before that date—such as her allegations about the lack of promotions or CL increases since 2018, (*see id.* at 60–61)—is untimely. But her allegations about her 2023 transfer to Major Growth Ventures and Hayes's selection as the new plant manager fall within the period and are timely. (*Id.*).

In sum, the only timely actions for Barinaga's Title VII claims are (1) the 2020 plant-manager decision; (2) any employment actions after November 5, 2022; and (3) Barinaga's

---

7 The Parties' summary-judgment briefs suggest that ExxonMobil decided to hire Blokker sometime in October 2020. (Dkt. No. 45 at 32); (Dkt. No. 52 at 19). The summary-judgment evidence does not support that timeline. Barinaga's deposition testimony and the testimony of an ExxonMobil employee indicate that the decision occurred around August 2020. (Dkt. No. 45-1 at 38); (*see* Dkt. No. 45-9 at 15).

transition to Major Growth Ventures and Hayes's selection as the new plant manager in 2023. The Court therefore excludes as untimely all other actions from its Title VII merits analysis below. *See infra* Section III(B).

b. <u>Section 1981 Claims</u>

Turning to Section 1981, ExxonMobil argues that some of the actions challenged in Barinaga's race-discrimination claims are untimely. (Dkt. No. 45 at 21 n.3). The Court again agrees.

Section 1981 does not contain a statute of limitations, so courts apply a catchall four-year statute of limitations under 28 U.S.C. § 1658. *Belton v. GEO Grp., Inc.*, No. 21-30144, 2021 WL 5832953, at *4 (5th Cir. Dec. 8, 2021) (per curiam). This four-year period applies to claims based on conduct occurring after the formation of the contract. *Nicholson v. W.L. York, Inc.*, No. 23-20440, 2024 WL 913378, at *3 (5th Cir. Mar. 4, 2024) (per curiam) (first citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S.Ct. 1836, 1845, 158 L.Ed.2d 645 (2004); and then citing *Mitchell v. Crescent River Port Pilots Ass'n*, 265 F.App'x 363, 367 (5th Cir. 2008) (per curiam)). In the employment context, any alleged racial discrimination that takes place during the plaintiff's employment occurs after the formation of the contract, thus subjecting it to the four-year statute of limitations. *Belton*, 2021 WL 5832953, at *4.

Barinaga sued ExxonMobil on August 22, 2022. (Dkt. No. 1-4). Four years before that date is August 22, 2018, meaning that anything beforehand is untimely. Some of Barinaga's allegations, however, predate that deadline. One example is when Barinaga claims that Shulman discriminated against her "because she was Hispanic," threatening

to ruin Barinaga's career, interfering with her evaluations and promotions, and creating a hostile work environment. (Dkt. No. 29 at 2–3). These allegations concern actions in 2015, years before the deadline, and thus cannot form the basis for Barinaga's Section 1981 claims.

But the remaining employment actions that Barinaga challenges did take place within the four-year window. For instance, ExxonMobil decided to hire Blokker over Barinaga in August 2020, (*see* Dkt. No. 45-1 at 38); (Dkt. No. 45-9 at 15), and ExxonMobil allegedly denied her promotions, raises, and employment assignments after August 2018, (Dkt. No. 29 at 10) (alleging that "[e]ach pay period, bonus assessment, raise evaluation, and advancement consideration (or lack thereof) constitutes an unlawful act and continues the adverse effects of the discrimination"). Thus, to the extent she challenges the August 2020 plant-manager decision and the lack of promotions or CL increases after August 22, 2018, those claims are timely.

Accordingly, Barinaga's Section 1981 claims against Shulman are untimely and do not survive summary judgment. Instead, the Court will only consider allegations about actions occurring after August 22, 2018, when addressing the merits of Barinaga's Section 1981 claims. *See infra* Section III(B).

**2. <u>State Claims</u>**

In addition to her federal claims under Title VII and Section 1981, Barinaga brought claims under the Texas Labor Code. (*See* Dkt. No. 29 at 7–9). These state-law claims are also untimely and suffer the same fate as Barinaga's federal claims.

Like Title VII, "the Texas Labor Code requires those claiming employment discrimination to file an administrative complaint with the [Texas Workforce Commission] before filing an action in court." *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 552 (5th Cir. 2020) (first citing Tex. Lab. Code §§ 21.201(a), .252(a), .254; and then citing *Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 169 (5th Cir. 2014)). A plaintiff seeking relief under the Texas Labor Code must also file an administrative complaint within 180 days from "the date the alleged unlawful employment practice occurred." Tex. Lab. Code §§ 21.202(a). But while "a plaintiff must file a charge of discrimination with the EEOC or the TCHR within 180 days of the discriminatory act," that timeframe is extended to 300 days "[i]f the plaintiff has initially instituted proceedings with a State or local agency such as the Texas Workforce Commission." *Frausto v. Sw. Airlines*, No. 4:19-CV-04718, 2020 WL 4060309, at *8 (S.D. Tex. June 26, 2020) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 278–79 (5th Cir. 2004)), *report and recommendation adopted*, No. 4:19-CV-04718, 2020 WL 4059855 (S.D. Tex. July 18, 2020).

Barinaga filed her first EEOC charge on April 1, 2021, (Dkt. No. 52-20), so 300 days before that would be June 5, 2020. But Barinaga complains about Deman and Shulman's conduct from 2015 and 2016, (Dkt. No. 52-20 at 3), which is far outside the statutory period. Her allegations based on that conduct are therefore untimely under Texas law.

But her retaliation-claim allegations about the 2020 plant-manager decision, (Dkt. No. 52-20 at 4), are timely. ExxonMobil's decision to hire Blokker and not Barinaga occurred in August 2020, (Dkt. No. 45-1 at 38); (Dkt. No. 45-9 at 15), roughly a month after the June 5, 2020, cutoff. Thus, her state-law claims predicated on that decision are timely.

Barinaga's second EEOC charge, filed on September 1, 2023, also complains of missed promotions or CL increases dating back to 2018. (Dkt. No. 45-1 at 59–61). But 300 days before the date of her second charge would be November 5, 2022. Allegations of missed promotions or CL increases dating back to 2018, (*id.* at 60–61), fall outside that window to the extent they relate to promotions or CL increased before November 5, 2022. Any allegations predating November 5, 2022, are thus untimely. Her transition to Major Growth Ventures and Hayes's selection as the new plant manager, however, are timely because both occurred after November 5, 2022. (*See id.*).

In short, the only timely actions for Barinaga's state-law claims are (1) any employment actions after November 5, 2022, and (2) Barinaga's transition to Major Growth Ventures and Hayes's selection as the new plant manager in 2023. All other actions are untimely and excluded from the Court's merits analysis of Barinaga's state-law claims.

**B. MERITS OF BARINAGA'S CLAIMS**

With timeliness resolved, the Court turns to the merits. ExxonMobil challenges all of Barinaga's claims: race-discrimination, national-origin discrimination, sex-discrimination, and retaliation claims under federal and state law. (Dkt. No. 45 at 22–34). The Court considers each in turn.

**1. <u>Race-Discrimination & National-Origin Discrimination Claims</u>**

Barinaga brings her race and national-origin discrimination claims under three statutes: (1) Title VII of the Civil Rights Act of 1964; (2) 42 U.S.C. § 1981; and (3) Chapter 21 of the Texas Labor Code. (*See* Dkt. No. 29 at 7–9). Although distinct, all three prohibit

the same basic behavior. Title VII prohibits an employer from discriminating "with respect to [an employee's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 guarantees all persons in the United States the "same right . . . to make and enforce contracts" and "the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). And the Texas Labor Code forbids employment discrimination "because of race, color, disability, religion, sex, national origin, or age." Tex. Labor Code § 21.051.

Because these claims effectively cover the same conduct, courts analyze race-discrimination claims "under Title VII, the Texas Labor Code, and Section 1981 . . . under the same Title VII framework." *Wallace v. Seton Fam. of Hosps.*, 777 F.App'x 83, 87 (5th Cir. 2019) (per curiam) (first citing *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (Title VII and 42 U.S.C. § 1981); and then citing *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (Texas Labor Code)).[8] And "[b]ecause courts follow Title VII jurisprudence when analyzing discrimination claims under the Texas Labor Code and § 1981," race-discrimination claims brought under all three statutes are

---

8 *See also Dunn v. Hunting Energy Servs.*, 288 F.Supp.3d 749, 768 (S.D. Tex. 2017) ("Courts in the Fifth Circuit 'evaluate claims of race discrimination under § 1981 using the same analysis as those under Title VII.'" (quoting *Bright v. GB Bioscience Inc.*, 305 F.App'x 197, 201 n.3 (5th Cir. 2008) (per curiam))); *Mott v. Schneider Elec. Sys., USA, Inc.*, No. 4:24-CV-03084, 2025 WL 1549461, at *2 (S.D. Tex. May 30, 2025) ("Courts apply the same standards when analyzing claims under Title VII and Chapter 21 of the Texas Labor Code." (citing *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004))); Tex. Lab. Code § 21.001(1) (stating one of the "general purposes of this chapter" is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964"); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) (holding that the claim for racial discrimination under the Texas Labor Code is interpreted the same as the federal law).

typically analyzed in the same analysis. *Brown v. S.A. Food Bank*, No. 23-50564, 2024 WL 1300286, at *2 n.7 (5th Cir. Mar. 27, 2024) (first citing *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022); and then citing *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321 (5th Cir. 2021)).

A plaintiff's national-origin discrimination claim under Title VII is also subject to the same analysis as a race-discrimination claim under Title VII. *Toro v. Fed. Express Corp.*, No. 4:15-CV-01448, 2016 WL 4800900, at *4 (S.D. Tex. Sept. 14, 2016). As a result, courts also analyze race-discrimination and national-origin discrimination claims together to "avoid redundancy." *Wheeler v. Amazon Web Servs.*, No. 4:22-CV-00370, 2024 WL 4253098, at *4 n.5 (S.D. Tex. July 12, 2024) (citing cases), *report and recommendation adopted*, No. 4:22-CV-00370, 2024 WL 4256436 (S.D. Tex. Sept. 18, 2024).

The Court therefore considers Barinaga's race and national-origin discrimination claims together under the Title VII framework. Under that framework, a plaintiff may establish a prima facie case of discrimination using either direct or circumstantial evidence. *Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 475 (5th Cir. 2015); *Portis v. First Nat. Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3, 103 S.Ct. 1478, 1481 n.3, 75 L.Ed.2d 403 (1983)), *as amended on denial of reh'g* (Nov. 10, 1994). "If the plaintiff presents only circumstantial evidence, then she must prove discrimination inferentially using '[t]he three-step *McDonnell Douglas-Burdine* "minuet."'" *Etienne*, 778 F.3d at 475 (quoting *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir. 1994) (per curiam)). But if "the plaintiff presents direct evidence of discrimination, 'the burden of proof shifts to the

employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Id.* (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)). And "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985)).

Barinaga argues that she has presented direct evidence of racial and national-origin discrimination based on Shulman's 2015 statement that she was "naïve to think that her being Hispanic was not the reason for where she was in her career." (Dkt. No. 52 at 24); (Dkt. No. 45-2 at 5). But as discussed above, *see supra* Section III(A), any complaints about Shulman's conduct are untimely and therefore excluded from the Court's merits analysis.[9]

---

[9]    Even if the Court considered Shulman's alleged statement, it would not constitute direct evidence. Direct evidence is "rare" and must, if believed, prove discrimination "without inference or presumption." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (first quoting *Portis*, 34 F.3d at 328; and then quoting *Brown*, 989 F.2d at 861). It must show "on its face that an improper criterion served as a basis . . . for the adverse employment action." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005)). The Fifth Circuit evaluates such comments under four factors: (1) relation to the plaintiff's protected characteristic; (2) proximity in time to the challenged decision; (3) whether made by a decisionmaker; and (4) whether connected to the adverse action. *Wilkinson v. Pinnacle Lodging, LLC*, No. 22-30556, 2023 WL 6518142, at *3 (5th Cir. Oct. 5, 2023) (quoting *Etienne*, 778 F.3d at 476). Remarks failing these criteria are treated as "stray" and cannot alone defeat summary judgment. *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (quoting *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)).

Although Shulman's comment implicates Barinaga's protected characteristic, (*see* Dkt. No. 45-2 at 5), it allegedly occurred in 2015 and is far removed from any employment decision the Court has deemed timely. Barinaga has not shown that it was connected to or proximate in time

(continue)

Apart from Shulman's statement, Barinaga relies on indirect evidence to support her race and national-origin discrimination claims. (*See* Dkt. No. 52 at 26). She must therefore prove discrimination inferentially under the *McDonnell Douglas-Burdine* paradigm. *Etienne*, 778 F.3d at 475 (quoting *Davis*, 14 F.3d at 1087). First, Barinaga "must establish a prima facie case of discrimination." *Belton*, 2021 WL 5832953, at *4. Second, if Barinaga meets her burden, ExxonMobil "must offer a legitimate, non-discriminatory reason for its actions." *Id.* (citing *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)). And third, Barinaga must "rebut the [ExxonMobil's] stated reasons and show that they are 'merely pretextual.'" *Id.* (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)).

a. Prima facie case

At the prima facie stage, Barinaga bears the "initial burden" to establish a "prima facie claim for race discrimination" and national-origin discrimination by showing four elements: (1) she "is a member of a protected group"; (2) she "was qualified for the position at issue"; (3) she suffered some adverse employment action by the employer"; and (4) she "was replaced by someone outside h[er] protected group or was treated less favorably than other similarly situated employees outside the protected group." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (quoting *Stroy v. Gibson ex rel. Dep't of Veteran Affs.*, 896 F.3d 693, 698 (5th Cir. 2018)).

---

to ExxonMobil's employment decisions. Standing alone, the remark lacks the required "nexus" between the statement and the alleged adverse employment actions. *See Pete v. City of Houston*, 719 F.App'x 334, 338 (5th Cir. 2018) (per curiam) (quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 416 (5th Cir. 2003)). It is therefore a stray remark, not direct evidence. *See id.*

ExxonMobil only challenges the fourth element, arguing that Barinaga has no evidence of ExxonMobil treating similarly situated white employees better than her under nearly identical circumstances. (Dkt. No. 45 at 23–24). The fourth element requires a Title VII claimant to identify at least one coworker outside of his protected class who was treated more favorably "under nearly identical circumstances." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). More specifically, a plaintiff must identify a comparator who shares (1) the same job or the same job responsibilities as her; (2) the same supervisor as her; and (3) a similar history of violations or infringements, if any. *Id.* Put simply, "[e]mployees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated." *Lee*, 574 F.3d at 259.

At this stage, ExxonMobil addresses only the alleged lack of CL promotions. (*See* Dkt. No. 45 at 23–24). As to Barinaga's other complaints, like her allegations about the plant-manager decisions, ExxonMobil assumes that she can establish her prima facie case—at least for summary-judgment purposes. (*Id.* at 24 n.5). The Court accordingly limits its analysis at this stage to Barinaga's complaints about the alleged lack of CL promotions that are timely. *See supra* Section III(A).

Addressing these claims, the Court agrees that Barinaga has not provided adequate comparator evidence and thus cannot meet her prima facie burden. Barinaga does not identify another similarly situated non-Hispanic employee who received a CL

increase in late 2022 or early 2023 when she didn't.[10]  On the contrary, the record shows that several other high-level employees did not receive CL promotions for the time period in question, including white male employees.  (Dkt. No. 45-2 at 4).  For instance, after reviewing the CLs of several executives, ExxonMobil decided not to promote Barinaga *or* two plant managers.  (Dkt. No. 45-12 at 3).

And while Barinaga complained that she "ha[d] not received a CL increase in over five years and three months" and had been denied CL increases, (Dkt. No. 29 at 5–7), CL promotions are not guaranteed to happen at a particular time, (Dkt. No. 45-5 at 4); (Dkt. No. 45-8 at 4).  As a result, "two and a half years without a CL increase was [not] exceptionally slow."  (Dkt. No. 45-9 at 20).  In fact, there are other examples of employees going five to six years without a CL increase.  (*See, e.g.*, Dkt. No. 45-4 at 9).

Thus, Barinaga's duration at the CL 32 level was not unusual.  (Dkt. No. 45-2 at 4); (Dkt. No. 45-5 at 4); (Dkt. No. 45-8 at 4).  This is especially true, given that Barinaga's CL shows that she was (and still is) in the top percentage of ExxonMobil executives.  (Dkt. No. 45-5 at 4).  She was even ahead of pace and had a higher CL than some vice presidents and some plant managers, including her direct supervisor who was the Baytown

---

[10]    Barinaga cites a couple of her exhibits for the proposition that "very many non-Hispanic, male employees were receiving increases, sometimes in years back-to-back."  (Dkt. No. 52 at 25) (referencing Dkt. Nos. 50-4, 50-5).  But one exhibit doesn't even discuss race or ethnicity, (*see* Dkt. No. 50-5) (SEALED), and the other exhibit also shows Hispanic, Asian, and American Indian employees receiving promotions on similar timeframes as white employees, (*see* Dkt. No. 50-4) (SEALED).  More importantly, nowhere does Barinaga (or her summary-judgment evidence) establish the responsibilities, experiences, qualifications, or other information of these alleged comparators.  (*See* Dkt. No. 52 at 25–26); (Dkt. Nos. 50-4, 50-5).  Barinaga's comparator argument thus falls flat.

Chemical Plant Manager. (Dkt. No. 45-2 at 4); (Dkt. No. 45-8 at 4); (Dkt. No. 45-13 at 3). And as a CL 33 now, Barinaga continues to have the same or higher CL than some plant managers and Vice Presidents. (Dkt. No. 45-2 at 4).

Without adequate comparator evidence, the Court finds that Barinaga has not met her prima facie burden on her racial-discrimination and national-origin discrimination claims based on the alleged lack of CL promotions. Accordingly, those claims fail as a matter of law.[11]

b. Legitimate, nondiscriminatory reasons

The Court now considers Barinaga's race and national-origin claims concerning the 2020 and 2023 plant-manager decisions. ExxonMobil assumes that Barinaga has established her prima facie case for these claims. (Dkt. No. 45 at 24 n.5). Therefore, the Court begins by assessing whether ExxonMobil's stated reasons for its actions (or

---

[11] Even if Barinaga's CL-promotion claims survived the prima facie stage, they would still fail under the remainder of the *McDonnell Douglas* analysis. ExxonMobil offered legitimate, nondiscriminatory reasons for the lack of CL increases, including that Barinaga did not receive "Outstanding" performance assessments, did not stand out from her peers, and that her CL was already ahead of pace and higher than some plant managers and vice presidents. (Dkt. No. 45 at 18, 27 & 27 n.6); *see Young v. Houston Lighting & Power Co.*, 11 F.Supp.2d 921, 930 (S.D. Tex. 1998) ("Basing a promotion decision on an assessment of qualifications qualifies as a legitimate, nondiscriminatory reason."); *Ricketts v. Champion Chevrolet*, 2005 WL 1924372, at *5 (S.D. Tex. Aug. 11, 2005) ("An employee's failure to meet performance criteria is a legitimate, non-discriminatory explanation for an employment decision.").

While Barinaga points to others who received CL increases without "Outstanding" ratings, (Dkt. No. 52 at 29) (referencing Dkt. Nos. 50-4, 50-5), she fails to show how those employees were similarly situated. *See Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (noting employee may show pretext "through evidence of disparate treatment"). This failure is particularly significant given that several other high-level employees—including white male employees—also did not receive CL promotions during the relevant period. (Dkt. No. 45-2 at 4).

inactions) underlying Barinaga's racial and national-origin discrimination claims are legitimate and nondiscriminatory.

First, as to the 2020 plant-manager decision, ExxonMobil claims that it decided to hire Blokker instead of Barinaga because Blokker was "the most qualified candidate" and "clearly better qualified" than Barinaga. (Dkt. No. 45 at 25). "Selection of a more qualified applicant is a legitimate and nondiscriminatory reason for preferring one candidate over another." *Sabzevari v. Reliable Life Ins. Co.*, 264 F.App'x 392, 395 (5th Cir. 2008) (per curiam) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251–53, 101 S.Ct. 1089, 1092–94, 67 L.Ed.2d 207 (1981)); *Caldwell v. Univ. of Hou. Sys.*, 520 F.App'x 289, 294 (5th Cir. 2013) (per curiam) ("[C]hoosing the best-qualified candidate 'constitutes a legitimate, non-discriminatory justification for its failure to promote [an employee].'" (quoting *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881–82 (5th Cir. 2003))); *Wagenfuhr v. BP Prods. N. Am., Inc.*, No. 3:11-CV-00135, 2012 WL 2568143, at *3 (S.D. Tex. June 29, 2012) ("Courts have repeatedly held that hiring a more qualified applicant is a legitimate, nondiscriminatory reason for not hiring a particular, less qualified applicant." (citing cases)), *aff'd*, No. 12-40783, 2013 WL 1245324 (5th Cir. Mar. 8, 2013). Thus, ExxonMobil's belief that Blokker was "the most qualified candidate" and "clearly better qualified" than Barinaga is a legitimate, nondiscriminatory reason for its 2020 plant-manager decision.

Second, as to the 2023 plant-manager decision, ExxonMobil offers several reasons: (1) Hayes was a stronger candidate because he could cross-pollinate refinery experience with chemicals experience; (2) Barinaga had already been selected and

approved for a different position; (3) Barinaga's new position gave her a better chance of reaching her full potential in the company; and (4) Barinaga had no refining experience and had not shown that she could make fast-paced risk-management decisions. (Dkt. No. 45 at 25–26). These reasons are sufficient. Again, "[s]election of a more qualified applicant is a legitimate and nondiscriminatory reason for preferring one candidate over another." *Sabzevari*, 264 F.App'x at 395. Indeed, the legitimacy of ExxonMobil's stated reasons becomes even clearer in light of ExxonMobil's explanation that Barinaga had already been selected and approved for a different position that gave her a better chance of reaching her full potential in the company. (Dkt. No. 45 at 25–26). Accordingly, ExxonMobil has offered legitimate, nondiscriminatory reasons for its 2023 plant-manager decision.

In sum, as to Barinaga's racial-discrimination and national-origin discrimination claims, ExxonMobil has provided legitimate, nondiscriminatory reasons for the 2020 and 2023 plant-manager decisions.

c. <u>Pretext</u>

Because ExxonMobil has provided legitimate, nondiscriminatory reasons, the burden now shifts to Barinaga to "rebut [ExxonMobil's] stated reasons and show that they are 'merely pretextual.'" *Belton*, 2021 WL 5832953, at *4 (quoting *Moss*, 610 F.3d at 922). "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 297 (5th Cir. 2024). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton v. Gap*

*Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Apart from credence, however, an employee can also show pretext "by providing evidence that similarly situated employees were treated more favorably." *Harris*, 92 F.4th at 297.

Barinaga claims that ExxonMobil's reasons for the 2020 and 2023 plant-manager decisions were pretextual.[12] (Dkt. No. 52 at 27–29). As to the plant-manager decisions, Barinaga argues that ExxonMobil's reasons were pretextual because (1) Barinaga was just as qualified as Blokker at the time of the 2020 plant-manager decision; (2) Barinaga was a better candidate than Hayes for the 2023 plant-manager decision because she had higher performance ratings and a higher CL level than Hayes; and (3) the timing of Barinaga's transfer and Hayes's selection makes the decision to hire Hayes "not credible." (*Id.*).

Barinaga's arguments fail to establish pretext. Most of Barinaga's allegations are not supported by any evidence. (*See id.* at 27–28). And without any evidence, Barinaga is "[s]imply disputing the underlying facts of an employer's decision," which "is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007). More is therefore required at this pretext stage, such as showing that employer (1) gave false explanations; (2) changed their explanations; (3) limited and segregated the employee in a way that adversely impacted the employee's performance;

---

12 It is unclear whether Barinaga asserts these pretext arguments in support of her race- or national-origin-discrimination claims. Her brief's discussion of pretext appears to omit any arguments related to race or national origin. (*See* Dkt. No. 52 at 27–29). For the sake of analysis, the Court assumes that her pretext arguments extend to her race- and national-origin discrimination claims.

or (4) failed to give the employee the same opportunities as other employees. *See, e.g.*, *Caldwell v. KHOU-TV*, 850 F.3d 237, 242–44, 246 (5th Cir. 2017).

But Barinaga has not provided more. As to ExxonMobil's reasons for the plant-manager decisions, Barinaga continues to assert that she was just as qualified and maybe more qualified than the individuals that ExxonMobil chose for those position. (Dkt. No. 52 at 27–29). But merely "showing that two candidates are similarly qualified does not establish pretext." *Dixon v. Comal County*, 447 F.App'x 638, 641 (5th Cir. 2011) (per curiam) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)).

Without more, Barinaga's pretext arguments as to the plant-manager decisions fail. After all, her subjective belief that she suffered discrimination because of her race or national origin is insufficient to survive summary judgment. *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). And because she fails to show pretext, she has not shown a genuine issue of fact on her race-discrimination and national-origin discrimination claims. Those claims therefore fail.

**2. <u>Sex-Discrimination Claims</u>**

Apart from race-discrimination and national-origin discrimination claims, Barinaga also brings sex-discrimination claims under Title VII and Chapter 21 of the Texas Labor Code. (Dkt. No. 29 at 10–12). Courts "evaluate sex-discrimination claims under Texas state law and Title VII similarly." *Sacchetti v. Optiv Sec., Inc.*, 819 F.App'x 251, 253 (5th Cir. 2020) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012); *see also Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) ("[T]he law governing claims under the TCHRA and Title VII is identical.");

*Bramlett v. Tarrant County*, No. 4:23-CV-00203, 2023 WL 11667632, at *3 n.3 (N.D. Tex. Nov. 27, 2023) ("Courts analyze Title VII and parallel claims under the Texas Labor Code identically. 'Because [the Texas Labor Code] is intended to correlate with Title VII, the same analysis is applied for each claim.'" (quoting *Allen v. Radio One of Tex. II, LLC*, 515 F.App'x 295, 297 (5th Cir. 2013) (per curiam))), *report and recommendation adopted as modified sub nom. Bramlett v. Tarrant County*, No. 4:23-CV-00203, 2024 WL 1464064 (N.D. Tex. Apr. 4, 2024); *Drerup v. Consol. Nuclear Sec., LLC*, No. 2:19-CV-00106, 2021 WL 2425257, at *13 n.6 (N.D. Tex. May 14, 2021) ("TCHRA sex discrimination claims are analyzed under the same standard as Title VII sex discrimination claims." (citing *Dudik v. Mesquite Rodeo*, No. 3:03-CV-00178, 2004 WL 524947, at *5 n.3 (N.D. Tex. Mar. 12, 2004))), *aff'd sub nom. Drerup v. Consol. Nuclear Sec., LLC*, No. 21-10600, 2022 WL 3335780 (5th Cir. Aug. 12, 2022); *Teague v. Williamson County*, No. 1:18-CV-01098, 2020 WL 2542869, at *5 n.4 (W.D. Tex. May 19, 2020) ("Sex discrimination claims brought under both the Title VII and the Texas Labor Code are evaluated using the same analytical framework." (first citing *Allen*, 515 F.App'x at 297; and then citing *Shackelford*, 190 F.3d at 403 n.2)).

Because the same standards apply to Barinaga's sex-discrimination claims, the Court simultaneously addresses them under the Title VII framework. And because Barinaga does not offer direct evidence of sex discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *See Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 219–20 (5th Cir. 2023).

a.    Prima facie case

To make a prima facie of sex-discrimination case, Barinaga "must show '(1) that she is a member of a protected class; (2) that she was qualified for the position sought; (3) she was subject to an adverse employment action; and (4) she was replaced by someone outside her protected class or was treated less favorably than other similarly situated employees outside her class.'"  *Newbury v. City of Windcrest*, 991 F.3d 672, 679 (5th Cir. 2021) (quoting *Haire v. Bd. of Supervisors of La. State Univ.*, 719 F.3d 356, 363 (5th Cir. 2013)).

ExxonMobil challenges only the fourth element, arguing that Barinaga has no evidence of ExxonMobil treating similarly situated male employees better than her under nearly identical circumstances.  (Dkt. No. 45 at 22–24).  "To satisfy the 'similarly situated' prong, the employee carries out a comparator analysis."  *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) (citing *Lee*, 574 F.3d at 259).  "Under this analysis, the employee must establish that she was treated less favorably than a similarly situated employee outside of her protected class in nearly identical circumstances."  *Id.* (citing *Lee*, 574 F.3d at 259–60).  "[N]early identical" does not mean strictly identical.  *Id.* (citing *Lee*, 574 F.3d at 260 n.25).  Instead, to determine if a comparator is sufficiently similar, courts consider "[a] variety of factors . . . when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications."  *Id.* (quoting *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)).

Like the race-discrimination and national-origin claims, ExxonMobil assumes that Barinaga can establish her prima facie case for sex discrimination in the plant-manager

decisions.  (Dkt. No. 45 at 24 n.5).  So the Court limits its analysis to Barinaga's complaints about the alleged lack of CL promotions that are still timely.  *See supra* Section III(A).

As to these CL claims, Barinaga argues that "comparators have not been passed over for promotion as many times as Barinaga has."  (Dkt. No. 52 at 25).  She further contends that all the men who received a recommendation for promotion were actually promoted, and "[t]he only two people who were denied a promotion after HR recommended one were women."  (*Id.* at 25–26).

But while the exhibit Barinaga references does indicate the position of the comparator employees, (Dkt. No. 50-4) (SEALED), nowhere does Barinaga explain the responsibilities, experiences, qualifications, or other information of these alleged comparators, (*see* Dkt. No. 52 at 25–26).  She thus fails to identify another similarly situated male employee who received a CL increase in the period in question.

In fact, the evidence cuts the other way.  Like Barinaga, other employees (both male and female) went five to six years without a CL increase.  (*See, e.g.*, Dkt. No. 45-4 at 9) (testimony about one female employee going six years without a CL increase and a male employee going five years without one).   And several other high-level male employees did not receive CL promotions for the time period in question.  (Dkt. No. 45-2 at 4).  Moreover, Barinaga's duration at the CL 32 level was not unusual compared to other male and female employees, (Dkt. No. 45-2 at 4); (Dkt. No. 45-5 at 4); (Dkt. No. 45-8 at 4), especially when Barinaga's CL shows that she was (and still is) in the top percentage of ExxonMobil executives, (Dkt. No. 45-5 at 4), and was ahead of pace and

had (and continues to have) a higher CL than some vice presidents and some plant managers, (Dkt. No. 45-2 at 4); (Dkt. No. 45-8 at 4); (Dkt. No. 45-13 at 3).

Because Barinaga has not offered adequate comparator evidence, she cannot meet her prima facie burden on her sex-discrimination claims that relate to the alleged lack of CL promotions. Accordingly, those claims fail.[13]

b. Legitimate, nondiscriminatory reasons

Barinaga's remaining sex-discrimination claims—those related to the 2020 and 2023 plant-manager decisions—fail for the same reasons that her race and national-origin claims failed: ExxonMobil has proffered legitimate, nondiscriminatory reasons for its conduct, which Barinaga has not shown are a pretext for sex discrimination.

To rebut Barinaga's sex-discrimination claims, ExxonMobil offers the same legitimate, nondiscriminatory reasons for its plant-manager decisions as it did for her race and national-origin discrimination claims. *See supra* Section III(B)(1)(b). Specifically, ExxonMobil asserts that it selected Blokker in 2020 and Hayes in 2023 because each was considered the most qualified candidate for the position, (Dkt. No. 45 at 25–26), and it

[13] And as with her race and national-origin claims based on a lack of CL promotions, even if Barinaga's sex-discrimination claim on this ground did not fail at the prima facie stage, it would not survive the remainder of the *McDonnell Douglas* analysis. *See supra* Section III(B)(1)(a). ExxonMobil provided legitimate, nondiscriminatory reasons for the absence of CL increases, including that Barinaga did not earn "Outstanding" performance assessments and did not stand out from her peers. (Dkt. No. 45 at 27 & 27 n.6); *see Young*, 11 F.Supp.2d at 930; *Ricketts*, 2005 WL 1924372, at *5. And Barinaga has not shown that those reasons are a pretext for sex discrimination. She points to other employees who received CL promotions, (Dkt. No. 52 at 29) (referencing Dkt. Nos. 50-4, 50-5), but does not show how those individuals were similarly situated to her, *see Laxton*, 333 F.3d at 578. This failure is particularly significant given that several other high-level male employees also did not receive CL promotions during the relevant period. (Dkt. No. 45-2 at 4).

further explains that Hayes's selection was based on his cross-functional experience, (Dkt. No. 45-5 at 4), as well as other nondiscriminatory considerations regarding Barinaga's experience and assignments, (*see* Dkt. No. 45 at 25–26).  Courts have recognized that hiring a more qualified applicant is a legitimate, nondiscriminatory reason for not promoting another candidate.  *See Caldwell*, 520 F.App'x at 294; *Sabzevari*, 264 F.App'x at 395; *Wagenfuhr*, 2012 WL 2568143, at *3.  Therefore, ExxonMobil has provided legitimate, nondiscriminatory reasons for the 2020 and 2023 plant-manager decisions.

c.     Pretext

As before, the burden shifts to Barinaga to show that those reasons are merely a pretext for sex discrimination.  *See Saketkoo*, 31 F.4th at 999.  Barinaga's pretext arguments reprise the same contentions she made with respect to her race and national-origin discrimination claims.  *See supra* Section III(B)(1)(c).

Barinaga contends that ExxonMobil's reasons for the 2020 and 2023 plant-manager selections are a pretext for discrimination.  (Dkt. No. 52 at 27–29).  She argues that she was just as qualified as—or more qualified than—the selected candidates, and points to the timing of certain transfers, alleged inconsistencies in the selection process, and broader claims of gender bias.  (*Id.*).

These arguments fail for the same reasons as her prior claims.  *See supra* Section III(B)(1)(c).  Barinaga offers no evidence that she was more qualified than Blokker or Hayes, nor does she substantiate her assertion that ExxonMobil prioritized male employees' careers at the expense of female employees.  (*See* Dkt. No. 52 at 27–29).  Her briefing largely lacks citations to any admissible evidence supporting these claims.  (*See*

*id.* at 27–28). Absent other evidence, Barinaga offers nothing more than her subjective belief that ExxonMobil's reasons were pretextual, and her belief that she suffered discrimination because of her sex is insufficient to survive summary judgment. *See Hornsby v. Conoco, Inc.*, 777 F.2d 243, 247 (5th Cir. 1985); *LeMaire*, 480 F.3d at 391 ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext.").

And even if Barinaga had shown she was similarly qualified to the successful candidates, "showing that two candidates are similarly qualified does not establish pretext." *Dixon*, 447 F.App'x at 641 (quoting *Price*, 283 F.3d at 723). Accordingly, Barinaga's pretext arguments do not raise a genuine issue for trial. Therefore, as with her race-discrimination and national-origin claims, *see supra* Section III(B)(1)(c), Barinaga failed to prove pretext as to her sex-discrimination claims. Her sex-discrimination claims thus fail.

**3. <u>Retaliation Claims</u>**

Finally, Barinaga brings retaliation claims under Title VII and the Texas Labor Code. (Dkt. No. 29 at 12). "[T]he law governing claims under the TCHRA and Title VII is identical." *Shackelford*, 190 F.3d at 403 n.2; *Bramlett*, 2023 WL 11667632, at *3 n.3 ("Courts analyze Title VII and parallel claims under the Texas Labor Code identically." 'Because [the Texas Labor Code] is intended to correlate with Title VII, the same analysis is applied for each claim.'" (quoting *Allen*, 515 F.App'x at 297); *Mott v. Schneider Elec. Sys., USA, Inc.*, No. 4:24-CV-03084, 2025 WL 1549461, at *2 (S.D. Tex. May 30, 2025) ("Courts apply the same standards when analyzing claims under Title VII and Chapter 21 of the

Texas Labor Code." (citing *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004))).

The Court addresses both retaliation claims under the Title VII framework because the same standards apply to both. And because Barinaga does not offer direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework. *See Saketkoo*, 31 F.4th at 999–1000 (first citing *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003); and then citing *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016)).

Beginning with her prima face case, Barinaga "must show [that] '(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.'" *Id.* at 1000 (some internal quotations omitted) (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020)).

ExxonMobil argues that Barinaga cannot satisfy her prima facie burden on her retaliation claims because she cannot show the third element: causation. (Dkt. No. 45 at 33). Generally, "to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Briceno-Belmontes v. Coastal Bend Coll.*, No. 2:20-CV-00114, 2022 WL 673854, at *6 (S.D. Tex. Mar. 5, 2022) (quoting *Manning*, 332 F.3d at 883). "This is because 'quite logically, if an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee

based on that conduct.'" *Id.* (quoting *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 434 (5th Cir. 2021)).

Otherwise, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Brown*, 969 F.3d at 577 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013)). "[T]he but-for standard does not apply at the prima facie case stage," however. *Id.* (citing *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019)). "Instead, '[a]t the prima facie case [stage], a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action.'" *Id.* (quoting *Garcia*, 938 F.3d at 243). But "[t]he protected act and the adverse employment action must be very close in time to establish causation by timing alone." *Id.* at 578 (quoting *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948–49 (5th Cir. 2015)). For this type of causal connection, the Fifth Circuit has held a period of two-and-a-half months, two months, and six-and-a-half weeks to be close enough timing. *Id.* (citing cases). But "[t]he Fifth Circuit has indicated that a four-month gap, alone, is too long to permit an inference of causation, even at the prima facie stage." *Briceno-Belmontes v. Coastal Bend Coll.*, No. 2:20-CV-0014, 2022 WL 912785, at *8 (S.D. Tex. Mar. 29, 2022) (italics omitted) (citing *Alkhawaldeh*, 851 F.3d at 428 n.23).

Barinaga cannot establish causation here. While Barinaga submitted her first complaint on July 23, 2018, (Dkt. No. 45-2 at 5), it wasn't until around two years later that ExxonMobil selected Blokker for the plant-manager position, (Dkt. No. 45-8 at 3). Likewise, Barinaga submitted her second complaint on November 20, 2020, (Dkt. No. 45-

2 at 6), and filed her first EEOC charge on April 1, 2021, (Dkt. No. 52-20). Yet, it wasn't until September 1, 2023—almost three years after Barinaga's second HR complaint and over two years after her first EEOC charge—that Hayes became the next Baytown Chemical Plant Manager. (Dkt. No. 45-2 at 7).

And as to the CL promotions, the only timely CL actions (or inactions) would be after November 5, 2022, for Barinaga's Title VII claims and after March 5, 2023, for her state-law claims. *See supra* Sections III(A)(1)(a), (2). So the next denial of a CL promotion that would still be timely would have taken place in late 2022 or early 2023. (Dkt. No. 45-12 at 3). But late 2022 or early 2023 is over a year after Barinaga filed her first EEOC charge on April 1, 2021. (Dkt. No. 52-20).

Thus, for both the plant-manager decisions and the CL promotions, these time gaps clearly fall outside the two-and-a-half-month, two-month, and six-and-a-half-week periods that have been close enough for the Fifth Circuit. *See Brown*, 969 F.3d at 578. And this amount of time even exceeds the four-month gap that "[t]he Fifth Circuit has indicated . . . is too long to permit an inference of causation, even at the prima facie stage." *Briceno-Belmontes*, 2022 WL 912785, at *8 (citing *Alkhawaldeh*, 851 F.3d at 428 n.23). Because Barinaga cannot even raise an inference of causation for her retaliation claims, she cannot satisfy her prima face burden for those claims. Her retaliation claims therefore fail.

Even if Barinaga were able to satisfy the prima facie burden for her retaliation claims, they again would fail because ExxonMobil has offered legitimate, nondiscriminatory reasons that Barinaga has not shown are pretextual. *See Saketkoo*, 31

F.4th at 1000. For the same reasons discussed above, *see supra* Sections III(B)(1)(b), (2)(b), ExxonMobil's proffered reasons for the 2020 plant-manager decision, 2023 plant-manager decision, and the alleged lack of CL promotions are legitimate and nondiscriminatory.

And Barinaga's pretext arguments for her retaliation claims—also the same for her other claims, (*see* Dkt. No. 52 at 27–29)—similarly fail for the reasons discussed above, *see supra* Sections III(B)(1)(b)–(c), (2)(b)–(c). Without sufficient evidence of pretext, Barinaga's retaliation claims do not survive summary judgment.

## IV. CONCLUSION

For the reasons above, the Court **GRANTS** Defendant ExxonMobil's Motion for Summary Judgment, (Dkt. No. 45), and **DENIES as moot** Defendant ExxonMobil's Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 59). Barinaga's claims are therefore **DISMISSED WITH PREJUDICE**.

It is SO ORDERED.

Signed on September 30, 2025.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**